IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-00063-01-CR-W-HFS |
| ) | |
| CARLOS JESUS ENCARANCION, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Encarancion's Motion to Suppress Evidence (doc #21). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On February 14, 2017, a criminal complaint was filed against defendant Carlos Jesus Encarancion. On February 23, 2017, the grand jury returned a one-count indictment against defendant Encarancion. The indictment charges that on February 13, 2017, defendant knowingly possessed with intent to distribute heroin, in an amount of 1000 grams or more.

On November 1, 2017, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Encarancion was represented by Assistant Federal Public Defender William J. Raymond. The Government was represented by Assistant United States Attorney D. Michael Green. The Government called Detective Brian Ruch of the Kansas City, Missouri Police Department and Detective Colin Smith of the Platte County Sheriff's Department as witnesses. Defendant Encarancion testified on behalf of the defense.

## II.  FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On February 13, 2017, at approximately 7:07 p.m., Detective Brian Ruch of the Kansas City, Missouri Police Department, who was assigned to the MOWIN Drug Interdiction Task Force, was on duty at the Greyhound Bus Station at 1101 Troost in Kansas City, Missouri.  (Tr. at 3-4)  A bus which had originated out of Dallas, Texas, arrived at the station.  (Tr. at 4)  Detective Ruch testified that they make a majority of their narcotics arrests off of that bus.  (Tr. at 4)  Detective Ruch was located just inside the passenger terminal doors as he watched passengers exit the bus.  (Tr. at 5-6)

2. Detective Ruch observed a person (later identified as defendant Encarancion) enter the bus terminal and walk past Ruch.  (Tr. at 6-7)  Detective Ruch's attention was drawn to Encarancion because Encarancion had a hood up over his head, canted his body as he walked by Ruch, and appeared to be trying to get out of the terminal without being seen.  (Tr. at 7, 28)  Detective Ruch testified that race does not play a factor in who he stops or searches.  (Tr. at 27)  Detective Ruch walked outside to where Encarancion was standing and talking to a cabbie about a fare.  (Tr. at 7)  Detective Ruch was dressed in a t-shirt, jeans and a jacket.  (Tr. at 12)  While Detective Ruch was armed, his firearm was concealed.  (Tr. at 12)  Two other officers, Detective Colin Smith and Detective Errol Riggins, were outside the bus station.  (Tr. at 11)  Detectives Smith and Riggins were 10 to 15 feet away from Detective Ruch and to the back side of Encarancion.  (Tr. at 11, 52)  Detective Ruch testified that the other detectives stayed back because Ruch was going to attempt to make a consensual contact with Encarancion and he did not want Encarancion to feel like his freedom of movement was inhibited.  (Tr. at 12)

3. Detective Ruch testified that he tapped defendant Encarancion on the shoulder, Encarancion turned around,[1] Ruch pulled out his badge, identified himself as a police officer with the Kansas City, Missouri Police Department, and asked if he could speak with Encarancion.  (Tr. at 8, 31-32)  Detective Ruch testified that Encarancion said, "Sure."[2]  (Tr. at 8)  Detective Smith testified that he was a little too far away to hear what Encarancion said, but he saw Encarancion shake his head yes.  (Tr. at 65)  Detective Ruch testified that if Encarancion would have tried to

---

[1] Defendant Encarancion testified that Detective Ruch grabbed his arm and turned him around. (Tr. at 76)

[2] Defendant Encarancion testified that he told Detective Ruch no.  (Tr. at 77)

2

get into the cab, Ruch would have backed away.³ (Tr. at 32) Detective Smith testified that if Encarancion would have tried to get in the cab and leave, he would not have stopped him. (Tr. at 64-65) Detective Ruch asked Encarancion for his bus ticket or his travel itinerary to see where he was coming from. (Tr. at 8) Encarancion presented Detective Ruch with his bus receipt and itinerary. (Tr. at 8-9; Government's Ex. 1) The receipt and itinerary showed that he originated out of Phoenix, Arizona. (Tr. at 9; Government's Ex. 1) Detective Ruch found this significant in that Phoenix is a known source city for narcotics. (Tr. at 10) The name on the one-way ticket was Jamie Lewis and it was purchased with $227.50 in cash. (Tr. at 10; Government's Ex. 1) Detective Ruch testified that sometimes people who are involved in drugs purchase tickets in cash so that there is no electronic transaction that can be traced. (Tr. at 10, 35) Detective Ruch asked Encarancion for some identification and Encarancion said that he did not have any. (Tr. at 23) Detective Ruch found this significant because most people have some sort of identification when they travel and it raises officers' suspicions when people do not have any proper identification. (Tr. at 23) Detective Ruch handed the receipt and itinerary back to Encarancion. (Tr. at 10-11)

4. Detective Ruch explained to defendant Encarancion that he talks to passengers that are riding the bus lines. (Tr. at 11) Detective Ruch stated that officers look for and interdict the flow of narcotics, but they also run into people who are wanted for various crimes, murder, robbery or who are on parole violations. (Tr. at 11) Detective Ruch explained that officers also look for people carrying large amounts of United States currency without any justifiable reason. (Tr. at 11) Detective Ruch then asked Encarancion for his consent to search the bag which he was carrying. (Tr. at 12) Detective Ruch testified that Encarancion verbalized either "sure" or "yeah."⁴ (Tr. at 12) Encarancion then bent down, untwisted a twist tie that was holding the zippers on the bag together, pulled the twist tie out through the loops, unzipped the bag, and backed away.⁵ (Tr. at 12) Detective Smith testified that he could not hear Encarancion's response when Detective Ruch asked to search his bag; he just saw Encarancion place the bag down, unzip it, and step away. (Tr. at 53, 66) Defendant Encarancion testified that when he was having the conversation with Detective Ruch by the cab, it was just Detective Ruch and him. (Tr. at 84) Encarancion did not know there were any other officers present at that time. (Tr. at 84-85) Encarancion further testified that Detective Ruch had not put him in handcuffs or pulled a gun on him. (Tr. at 84)

---

³Defendant Encarancion testified that he could not get in the cab because Detective Ruch was standing in the way. (Tr. at 78) Defendant Encarancion further testified that he did not feel like he was free to go after Detective Ruch showed him his badge. (Tr. at 78)

⁴Defendant Encarancion testified: "And he asked me do you mind if I search your bag, and when he asked me that I said, yeah, I do mind because I'm trying to get in the cab so I could leave." (Tr. at 77)

⁵Defendant Encarancion testified that he felt that he had to comply. (Tr. at 79)

3

5. Detective Ruch kneeled down and searched the bag. (Tr. at 13) Inside the bag, Detective Ruch found male clothes and a pair of women's wedge shoes (sandals), which Ruch testified he found very odd. (Tr. at 13, 19) Detective Ruch pulled out one shoe and testified that it felt very heavy, like it was concealing something inside it. (Tr. at 13-14) Detective Ruch looked at the shoe and testified that it looked like the shoe was glued back together, which raised his suspicion even further that something was concealed inside the sole of the shoe. (Tr. at 14, 16) Detective Ruch asked defendant Encarancion if these were his mother's shoes. (Tr. at 14, 54-55) Detective Ruch testified that Encarancion "kind of gave me a funny 'Yeah.'" (Tr. at 14) Detective Smith testified that Encarancion "did like a nervous laugh" and then said "Yeah." (Tr. at 55) Detective Ruch testified that Encarancion was now starting to perspire on his face and lip, which Ruch found odd because it was chilly outside. (Tr. at 15) Detective Smith testified that he noticed a little bit of sweat on Encarancion's face and that Encarancion seemed really nervous. (Tr. at 54)

6. Detective Ruch asked defendant Encarancion to follow him inside so that Ruch could inspect the shoes a bit further. (Tr. at 17, 55) Detective Ruch picked up Encarancion's bag with the shoes in it and walked towards the front main entrance doors to the Greyhound Bus Station. (Tr. at 17, 55) Encarancion followed Detective Ruch.[6] (Tr. at 17, 55) Detective Smith testified that he did not see Detective Ruch have his hand on or near Encarancion. (Tr. at 67) Detective Smith testified that Encarancion was free to leave, but he would have had to leave his bag with Detective Ruch. (Tr. at 67)

7. Detective Ruch and defendant Encarancion went into an office located in the back of the station. (Tr. at 17) Detective Smith joined them in the office. (Tr. at 17, 56-57) Detective Ruch and Detective Smith each testified that Encarancion was free to leave, but Encarancion was not told that he was free to leave.[7] (Tr. at 39, 68-69) Detective Smith sat with Encarancion in the office while Detective Ruch took the bag to a luggage storage area where Detective Acton and his narcotics K-9 performed a sniff check of Encarancion's bag and several other bags which were in the luggage storage area. (Tr. at 18, 57) The K-9 did not alert to any of the bags. (Tr. at 18) Detective Ruch took the bag back to the office where Detective Smith and Encarancion were sitting. (Tr. at 19) Detective Ruch estimated that Encarancion had been in the office for five minutes at the most. (Tr. at 19)

8. Detective Ruch took the shoes (sandals) out of the bag, put them on the desk, and asked defendant Encarancion for his permission to cut along the seam. (Tr. at 19,

---

[6]Defendant Encarancion testified that he did not follow Detective Ruch; rather Detective Ruch grabbed his arm and walked him to the back room. (Tr. at 80)
[7]Defendant Encarancion testified that he did not feel that he was free to leave. (Tr. at 81-82)

4

57) Detective Ruch testified that Encarancion nodded and said "Sure."[8] (Tr. at 19) Detective Smith testified that Encarancion put his head down and said sure or something like that. (Tr. at 58) Detective Ruch testified that neither he nor Detective Smith had their guns drawn. (Tr. at 19) Encarancion was not in handcuffs. (Tr. at 19) Detective Smith cut along the seam of the shoe, peeled back the shoe, and revealed a clear plastic baggie with a brown substance inside the baggie. (Tr. at 19-20; Government's Exs. 4, 5 and 6) The other shoe contained another baggie with a brown substance inside. (Tr. at 21-22; Government's Ex. 8) The brown substance was field tested and it had a positive response for heroin. (Tr. at 20, 22, 59) Encarancion was placed under arrest for possession of a controlled substance. (Tr. at 23, 58-59)

9. Defendant Encarancion was twenty years old, born in Phoenix, Arizona, and a lifelong resident of the Phoenix area. (Pretrial Services Report (doc #7) at 1) Detective Ruch testified that his interactions with Encarancion were in English. (Tr. at 15) Detective Ruch further testified that Encarancion did not appear to have any trouble understanding what Ruch was saying and that Ruch did not have any trouble understanding what Encarancion was saying back to him. (Tr. at 15) Detective Ruch testified that Encarancion appeared to be sober and of average intelligence. (Tr. at 44) Detective Ruch testified that Encarancion never told Ruch no at any point for anything Ruch asked of him. (Tr. at 43) Detective Smith testified that he did not hear Encarancion at any time tell Detective Ruch no. (Tr. at 66)

10. The parties stipulated to the following facts regarding video surveillance:

> On February 13, 2017, Kansas City, Missouri Police Department Detectives Errol Riggins and Brian Ruch were working interdiction duty at the Greyhound Bus Terminal when they encountered Carlos Jesus Encarancion, who disembarked from a bus which had originated in Dallas, Texas. Encarancion exited the terminal and went outside to hail a taxi at which point he was approached by Detective Ruch. The bus terminal is equipped with a video surveillance system which can record events which occur outside the terminal. The standard procedure for bus terminal interdictions resulting in an arrest is for one of the detectives involved in the arrest to request from the terminal's manager any surveillance footage of the incident. The encounter with Encarancion occurred in the evening of February 13, 2017, which means that the manager would not have been on duty and the request for the video would have had to been made the next day. In this case, Detective Riggins did not request the surveillance footage of the incident. Therefore, since Detective Ruch also did not make the request at the time, no contemporaneous request for the video was

---

[8] Defendant Encarancion testified that at this point, he felt that it did not matter what he said. (Tr. at 83)

5

made. The Greyhound Terminal keeps footage for 30 days before it is taped over. By the time an inquiry was made to Greyhound by detectives to determine if they still had footage from February 13, 2017, it was learned that the Greyhound Terminal no longer had footage from that date.

(Stipulation of Facts Regarding Greyhound Bus Terminal Video Surveillance on February 13, 2017 (doc #33) at 1-2)

## III. DISCUSSION

Defendant Encarancion seeks to suppress all evidence obtained during a search of his bag. (Motion to Suppress Evidence (doc #21) at 2) Defendant argues that the seizure of his person was improper because the police did not have reasonable suspicion to stop him and/or place him in custody. (Id.) Defendant further argues that the subsequent search of his bag violated his Fourth Amendment rights. (Id. at 3)

The Supreme Court has described three categories of police-citizen encounters. The first is communication between police and citizens which involves no coercion or restraint of liberty and, therefore, is outside the scope of the Fourth Amendment. The second is a brief, minimally intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity. The third is a highly intrusive full-scale arrest which must be supported by probable cause. The minimally intrusive stop supported by reasonable suspicion and the full-scale arrest supported by probable cause involve Fourth Amendment considerations. See United States v. Cortez, 449 U.S. 411, 417 (1981); Reid v. Georgia, 448 U.S. 438, 440 (1980); Brown v. Texas, 443 U.S. 47, 50 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); Terry v. Ohio, 392 U.S. 1, 16-19 (1968); United States v. Campbell, 843 F.2d 1089, 1092-95 (8th Cir. 1988).

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place and asking him questions. See United States v. Jones, 990 F.2d 405,

6

408 (8th Cir.), cert. denied, 510 U.S. 934 (1993); United States v. Campbell, 843 F.2d 1089, 1092 (8th Cir. 1988). No objective justification is required for such an encounter because no constitutional interest is implicated. See United States v. Mendenhall, 446 U.S. 544, 554-55 (1980); United States v. Nunley, 873 F.2d 182, 184 (8th Cir. 1989); Campbell, 843 F.2d at 1092. Likewise, a search of an individual's baggage done with the individual's consent does not automatically escalate the consensual encounter into an investigative stop. See Florida v. Bostick, 501 U.S. 429, 435 (1991); United States v. Robinson, 984 F.2d 911, 914 (8th Cir. 1993). A court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. See Bostick, 501 U.S. at 439; Robinson, 984 F.2d at 913. As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred. See Bostick, 501 U.S. at 434; Robinson, 984 F.2d at 913-14.

In the present case, the initial contact between Detective Ruch and defendant Encarancion was consensual. Detective Ruch approached Encarancion in a public place, identified himself as a police officer and asked if he could speak with Encarancion. (Fact No. 3) Defendant Encarancion agreed to speak with Detective Ruch.[9] (Id.) Detective Ruch asked Encarancion if he could see his bus ticket or his travel itinerary. (Id.) Encarancion provided his bus receipt and

---

[9]The Court acknowledges that this finding is inconsistent with the testimony of defendant Encarancion. However, based upon the testimony of Detective Ruch and Detective Smith, which conflicts with that of defendant, the Court finds that defendant agreed to speak with Detective Ruch.

7

itinerary to the detective. (Id.) Detective Ruch asked Encarancion for some identification and Encarancion said that he did not have any. (Id.) Detective Ruch handed the bus receipt and itinerary back to Encarancion. (Id.) Detective Ruch then asked if he could search Encarancion's bag. (Fact No. 4) The Court finds that a reasonable person would have felt free to decline Detective Ruch's requests and terminate the encounter. Thus, Detective Ruch's request to search came during the course of a consensual encounter and was permissible with or without reasonable suspicion. See United States v. White, 81 F.3d 775, 779 (8th Cir. 1996)(request to search made during consensual encounter is permissible with or without reasonable suspicion).

A search that is conducted pursuant to a valid consent does not violate the Constitution. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983); United States v. Matthews, 603 F.2d 48, 51 (8th Cir. 1979), cert. denied, 444 U.S. 1019 (1980). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See United States v. Palacios-Suarez, 149 F.3d 770, 772 (8th Cir. 1998); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983); United States v. Dennis, 625 F.2d 782, 793 (8th Cir. 1980). In United States v. Sanchez, 156 F.3d 875 (8th Cir. 1998), the Eighth Circuit Court of Appeals set forth the following with respect to the relevant circumstances:

> Whether consent is voluntary depends upon the "totality of the circumstances." When evaluating such circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose. Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation. To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the

encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

Id. at 878 (citations omitted). The government bears the burden of proving that consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007).

Based on the evidence presented at the hearing, the Court finds that only a short time elapsed from the time Detective Ruch initially approached defendant Encarancion to the time when Detective Ruch asked Encarancion if he could search his backpack, Ruch replied in the affirmative, and then placed the bag down, unzipped it, and stepped away. (Fact Nos. 3 and 4) Up until this time, Detective Ruch was the only officer who had any contact with Encarancion and they were in a public place. (Fact Nos. 2 and 4) No evidence was presented to suggest that Detective Ruch had threatened or coerced Encarancion to look in his bag. Evidence was presented that Detective Ruch had neither put Encarancion in handcuffs nor displayed a firearm. (Fact No. 4) Defendant Encarancion was twenty years old, born in Phoenix, Arizona, and a lifelong resident of the Phoenix area. (Fact No. 9) Detective Ruch testified that Encarancion did not appear to have any trouble understanding what Ruch was saying and that Ruch did not have any trouble understanding what Encarancion was saying back to him. (Id.) Detective Ruch testified that Encarancion appeared to be sober and of average intelligence. (Id.) At no point in time did Encarancion tell Detective Ruch not to look through his bag. (Id.) While Detective Ruch did not advise defendant Encarancion that he did not have to consent to a search, Ruch was under no obligation to do so. See United States v. Palacios-Suarez, 149 F.3d 770, 773 (8th Cir. 1998). See also United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001)("awareness of the right to refuse is not necessary for consent to be voluntary"). Further, a request for consent to search a

9

bag implies that consent can be refused.  See United States v. Drayton, 536 U.S. 194, 207 (2002) ("And when [Officer] Lang requested to search Brown and Drayton's persons, he asked first if they objected, thus indicating to a reasonable person that he or she was free to refuse."); United States v. Va Lerie, 424 F.3d 694, 710 (8th Cir. 2005)("Investigator Eberle did seek permission to search the luggage, which implied Va Lerie could refuse permission and, therefore, supports a finding of voluntary consent").  The Court finds that the government met its burden in establishing that defendant Encarancion's consent to search his bag was freely and voluntarily given and not the result of duress or coercion.

Inside the bag, Detective Ruch found a pair of women's sandals which he testified felt very heavy, like they were concealing something within them.  (Fact No. 5)   Further, Detective Ruch testified that it looked as if the shoes were glued back together, which rasied his suspicion even further that something was concealed inside the soles of the shoes.  (Id.)  Detective Ruch asked Encarancion if the shoes belonged to his mother and Encarancion gave a nervous laugh and said, "Yeah."  (Id.)  Encarancion was also starting to perspire on his face, despite the cool temperature.  (Id.)  After Detective Ruch discovered the shoes that he suspected were concealing contraband, he seized the bag.  (Fact No. 6)

"In order for police officers to briefly detain luggage for a sniff search without violating the Fourth Amendment, they must have either the owner's consent or a reasonable suspicion supported by articulable objective facts that the luggage contains drugs."  United States v. Green, 52 F.3d 194, 197-98 (8th Cir. 1995).   When Detective Ruch seized the bag, he knew that defendant Encarancion had come from Phoenix, Arizona, a known source city for narcotics (Fact No. 3), that Encarancion appeared to be trying to get out of the terminal without being seen, given how he had a hood up over his head and canted his body as he walked by Ruch (Fact No. 2), that Encarancion's

10

one-way bus ticket was purchased with cash (Fact No. 3), that Encarancion had no identification on him (Fact No. 3), that Encarancion's bag contained a pair of women's sandals which felt very heavy, like they were concealing something within them, and looked as if they were glued back together (Fact No. 5), that Encarancion gave a nervous laugh and said "Yeah" when asked if they were his mother's shoes (Fact No. 5), and that Encarancion began to sweat, despite the cool temperature outside (Fact No. 5). The Court finds that Detective Ruch had a reasonable suspicion supported by articulable objective facts that the shoes inside the bag contained drugs, giving Detective Ruch the authority to briefly detain defendant Encarancion and his bag.

Detective Ruch picked up the bag and asked defendant Encarancion to follow him inside so that Ruch could inspect the shoes a bit further. (Fact No. 6) Encarancion followed Detective Ruch to an office in the back of the station.[10] (Fact Nos. 6 and 7) Detective Ruch took Encarancion's bag to a luggage storage area so that a narcotics K-9 could perform a sniff check of the bag. (Fact No. 7) The Court finds that a legitimate law enforcement purpose was furthered by taking the bag from the public area outside the bus station to the private luggage storage area so that a sniff check of the bag could be performed and then to the private office so that the officers could further inspect the shoes which had been discovered after Encarancion consented to the search of his bag. After Encarancion had been in the office for approximately five minutes with Detective Smith, Detective Ruch returned with the bag, took the shoes out of the bag, and asked Encarancion for his permission to cut along the seam. (Fact Nos. 7 and 8) Encarancion said "Sure." (Fact No. 8)

---

[10]Again, the Court acknowledges that this finding is inconsistent with the testimony of defendant Encarancion. However, based upon the testimony of Detective Ruch and Detective Smith, which conflicts with that of defendant, the Court finds that defendant Encarancion followed Detective Ruch without Ruch grabbing Encarancion's arm.

11

The fact that Detective Ruch asked defendant Encarancion for his permission to cut along the seam of the shoes would have indicated to Encarancion that he was free to withhold his permission.  See United States v. Drayton, 536 U.S. 194, 207 (2002); United States v. Va Lerie, 424 F.3d 694, 710 (8th Cir. 2005).  No evidence was presented to suggest that the officers had threatened or coerced defendant Encarancion to obtain his consent.  Evidence was presented that Encarancion had not been put in handcuffs and the officers had not displayed any firearms.  (Fact No. 8)  Again, Defendant Encarancion was twenty years old, born in Phoenix, Arizona, and a lifelong resident of the Phoenix area.  (Fact No. 9)  Detective Ruch testified that Encarancion did not appear to have any trouble communicating with the officers and that he appeared to be sober and of average intelligence.  (Id.)  Finally, Encarancion never told Detective Ruch no at any point for anything Ruch asked of him.  (Id.)  Consent can be requested and given during an investigative stop.  See Florida v. Royer, 460 U.S. 491, 501-02 (1983)("had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him").  Considering the totality of the circumstances, the Court finds that the government has met its burden in establishing that defendant Encarancion's consent to search the shoes was freely and voluntarily given and not the result of duress or coercion.

## IV.  CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Encarancion's Motion to Suppress Evidence (doc #21).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

      */s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE
